## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARY E. MOULTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 15-293-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Karen Yvette Vicks, Esquire of the Law Office of Karen Y. Vicks, LLC, Dover, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware, and Dina White Griffin and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: August 31, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Mary Moulton ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting

Commissioner of Social Security ("defendant"), denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and

XVI, respectively, of the Social Security Act (the "Act") prior to August 1, 2012. *See* 42

U.S.C. §§ 401-434, 1381-1383f. Presently before the court are the parties' cross-

motions for summary judgment. (D.I. 15, 17) The court has jurisdiction pursuant to 42

U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB and SSI on April 19, 2009, alleging disability

beginning on February 20, 2009. (D.I. 10-5 at 2-3)[2] Plaintiff's claim was initially denied

on July 15, 2009, and after reconsideration on September 4, 2009. (D.I. 10-3 at 2-5;

D.I. 10-4 at 2-5, 10-14) On September 14, 2010, after a hearing on July 29, 2010, the

ALJ issued an unfavorable decision, finding plaintiff was not disabled under the Act for

the relevant time period from February 20, 2009 through the date of the decision. (D.I.

10-3 at 6-22) Plaintiff then filed a request for Appeals Council review on September 24,

2010. (D.I. 10-4 at 55-56) On August 30, 2012,[3] the Appeals Council granted plaintiff's

---

[1] Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . 42 U.S.C. § 405(g).
[2] The court cites to page numbers assigned by ECF.
[3] After plaintiff requested that the U.S. Senator's office intervene.

request and remanded the matter back to the ALJ for further administrative
proceedings. (D.I. 10-5 at 40-52; D.I. 10-3 at 23-28) On May 10, 2013, plaintiff
voluntarily amended her alleged onset of disability to October 14, 2009. (D.I. 10-5 at
100) The ALJ held a second hearing on May 21, 2013. (D.I. 10-2 at 72-95) On July
25, 2013, the ALJ again issued an unfavorable decision, finding plaintiff was not
disabled from October 14, 2009 through the date of the decision. (*Id.* at 12-35) After an
unsuccessful appeal to the Appeals Council, plaintiff filed the instant appeal. (*Id.* at 2-6)

### B. Medical History

#### 1. Health history prior to the relevant period

On September 26, 2007, neurologist Dr. Robert J. Varipapa[4] ("Dr. Varipapa")
evaluated plaintiff. Plaintiff reported that her sharp pain, numbness, balance difficulties,
and paresthesia[5] had become more intolerable in the last two months. Plaintiff also
reported starting to use a CPAP machine for her obstructive sleep apnea the night
before. Plaintiff weighed 245 pounds. Dr. Varipapa's impressions were diabetes
mellitus, peripheral neuropathy, obstructive sleep apnea, hypertension,
hypercholesterolemia, and chronic low back pain. Dr. Varipapa suggested starting a
course of Cymbalta[6] and discontinuing Neurontin[7] in an attempt to help plaintiff lose
weight. (D.I. 11-1 at 55-58) On October 25, 2007, plaintiff reported to Dr. Varipapa that

---

[4] With CNMRI: Neurology, Sleep Medicine, MRI.

[5] "A sensation of pricking, tingling, or creeping on the skin having no objective cause
and usually associated with injury or irritation of a sensory nerve or nerve root."
*Merriam-Webster Unabridged* (2016).

[6] Cymbalta is used to treat major depressive disorder in adults. It is also used to treat
pain caused by nerve damage in adults with diabetes (diabetic neuropathy). *See*
https://www.drugs.com/cymbalta.html (last visited August 10, 2016).

[7] Neurontin is used in adults to treat nerve pain. *See*
https://www.drugs.com/neurontin.html (last visited August 10, 2016).

the pain, tingling, and itching had resolved, but she continued to have numbness in both feet. She was taking Cymbalta and had discontinued Neurontin. Dr. Varipapa prescribed Lyrica.[8] (D.I. 11-1 at 53-54) On February 27, 2008, plaintiff returned to Stephanie Behrens, PA-C[9] ("Behrens") for a recheck of cough. Behrens assessed plaintiff with lower-extremity edema. (D.I. 11-1 at 6-7) On March 20, 2008, plaintiff reported severe leg swelling in both legs to Dr. Sharad Patel[10] ("Dr. Patel"). Dr. Patel increased plaintiff's dosage of Lasix.[11] Plaintiff also presented with a cough and wheezing, for which Dr. Patel prescribed Entex PSE.[12] (D.I. 11-1 at 4-5) On April 23, 2008, plaintiff weighed 268 pounds.[13] Dr. Patel rated plaintiff's lower extremity edema as 2+. (D.I. 11 at 148-49)

On June 12, 2008, plaintiff went to the emergency room at Bayhealth Medical Center after feeling unwell the previous day and feeling disoriented in the morning. The care providers found that plaintiff's blood sugar was elevated and diagnosed that plaintiff's diabetes was "out of control." (D.I. 11 at 28-40) On June 16, 2008, plaintiff

---

[8] Lyrica (pregabalin) affects chemicals in the brain that send pain signals across the nervous system. It is used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy). *See* https://www.drugs.com/lasix.html (last visited August 10, 2016).

[9] With Dover Family Physicians.

[10] With Dover Family Physicians.

[11] Lasix is used to treat fluid retention (edema). *See* https://www.drugs.com/lasix.html (last visited August 10, 2016).

[12] Entex is used to relieve congestion, cough, and throat and airway irritation due to colds, flu, or hay fever. *See* https://www.drugs.com/cdi/entex-pse-sustained-release-tablets.html (last visited August 10, 2016).

[13] Plaintiff's highest recorded weight. Plaintiff has been classified as obese to morbidly obese. (See e.g., D.I. 11-2 at 32, 48) Plaintiff's medical records reflect her height as 5 feet 4 inches, however, at a consultative examination on October 25, 2012, plaintiff's height was recorded as 5 feet 1 inch tall and she weighed 234 pounds. (D.I. 11-1 at 97)

3

followed up with Dr. Jerome Abrams[14] ("Dr. Abrams") and reported high glucose readings. Plaintiff was prescribed Glucotrol.[15] (D.I. 11 at 141-42) On June 25, 2008, plaintiff followed up with Dr. Patel and reported that her blood sugar readings were much improved. (D.I. 11 at 139-40) On September 29, 2008, plaintiff went to the emergency room at Bayhealth Medical Center reporting that her left arm was heavy and numb and she had chest pain. The care providers diagnosed hypokalemia (low potassium) and gave plaintiff an "intravenous K rider," which promptly resolved her symptoms. Plaintiff was told to increase her potassium intake. (D.I. 11 at 10-27) On October 1, 2008, plaintiff followed up with Dr. Patel and was much improved. Plaintiff was prescribed Amitriptyline HCl[16] for her neuropathy. Plaintiff requested a referral to an endocrinologist. (D.I. 11 at 137-38)

In 2009, plaintiff continued to receive care for her foot pain complaints. On February 18, 2009, Dr. Patel noted plaintiff was compliant with dietary changes, but not with exercise. Plaintiff reported that she had no side effects from her medications; felt well and had only minor complaints; had no complaints related to her hypertension and hyperlipidemia; and denied muscle cramps or muscle weakness. Plaintiff was advised to consider lap band surgery for weight loss. (D.I. 11 at 114-15) On March 25, 2009, plaintiff reported to Dr. Varipapa increasing pain and numbness of her feet; difficulty walking for a distance or standing for long periods of time; and lower back pain. Dr. Varipapa noted that plaintiff had lost 35 pounds since her last visit, which plaintiff

---

[14] With Dover Family Physicians.

[15] Glucotrol is used together with diet and exercise to treat type 2 diabetes. *See* https://www.drugs.com/glucotrol.html (last visited August 10, 2016).

[16] Amitriptyline is used to treat symptoms of depression and may also be used for other purposes. *See* https://www.drugs.com/amitriptyline.html (last visited August 10, 2016).

4

credited to discontinuing Lyrica. In discussing Dr. Varipapa's previous recommendations, plaintiff indicated she would not pursue lap band surgery, consult a podiatrist, or restart Lyrica with appropriate food controls. Plaintiff agreed to continue Cymbalta. (D.I. 11 at 5-7) On June 20, 2009, plaintiff consulted Dr. Blanca Ocampo-Lim[17] ("Dr. Blanca") for her diabetes. Plaintiff reported weight gain. Dr. Blanca noted that plaintiff's diabetes was improving and plaintiff consented to insulin therapy. (D.I. 11 at 65-68)

On July 13, 2009, Dr. K Swami[18] ("Dr. Swami") performed a physical residual functional capacity ("RFC") assessment. Dr. Swami found that plaintiff was capable of occasionally or frequently lifting and carrying up to 10 pounds; standing and/or walking for at least 2 hours in an eight-hour workday, and sitting for about 6 hours in an 8-hour workday; unlimited pushing and/or pulling; occasionally climbing ramps, stairs, ladders, or scaffolds, balancing, stooping, kneeling, crouching, or crawling. Plaintiff had no manipulative, visual, communicative, or environmental limitations. Dr. Swami found plaintiff partially credible. He attributed the specified limitations to her lower back pain, deteriorating disk in her lower back, diabetes (with some end organ damage), neuritis in the feet, high blood pressure, and high cholesterol. He also noted her obesity with a body mass index as high as 44 and sleep apnea. He explained in a vocational analysis that plaintiff has physical restrictions, cannot return to her past work, and has no transferable skills. Dr. Swami found that plaintiff was capable of sedentary work and listed three occupations with an SVP[19] of 2. (D.I. 11 at 72-81)

---

[17] With Smyrna Internal Medicine & Endocrinology.
[18] A non-examining agency physician.
[19] Specific Vocational Preparation.

5

On July 29, 2009, plaintiff consulted with Behrens for depression and ankle pain. Behrens reported that the ankle has lateral joint line tenderness with localized swelling. Plaintiff had full range of motion and a normal gait. Behrens prescribed Xanax[20] for depression and Naprosyn[21] for ankle pain. (D.I. 11 at 82-84) On August 6, 2009, plaintiff followed up with Dr. Varipapa for her pain, numbness, and tingling in feet, obstructive sleep apnea, and headaches. Plaintiff indicated she was trying to quit smoking. Dr. Varipapa found that plaintiff's cranial nerves were grossly intact and she had no gross motor deficits, with a normal gait and balance. He ordered an MRI and prescribed Topamax[22] and Trazodone.[23] (D.I. 11 at 91-92) On August 13, 2009, Dr. Varipapa reported that plaintiff's MRI showed "disk herniation seen as mild disk protrusion to the right suggested at C5/6. Clinical correlation for associated radiculopathy suggested." (D.I. 11 at 93-97) At plaintiff's request, Dr. Varipapa completed a form for the Delaware Health and Social Services Division of Social Services on August 20, 2009. He opined that plaintiff suffered from peripheral neuropathy with burning dysesthesia in the lower extremities, obstructive sleep apnea, migraine headaches, and chronic lower back pain. He indicated that plaintiff could not work at her usual occupation for a period of 6-12 months and could not work full-time. Plaintiff could participate in classroom training. (D.I. 11 at 99)

---

[20] Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. *See* https://www.drugs.com/xanax.html (last visited August 10, 2016).
[21] Naprosyn is used to treat pain or inflammation. *See* https://www.drugs.com/naprosyn.html (last visited August 10, 2016).
[22] Topamax is used to prevent migraine headaches in adults. *See* https://www.drugs.com/topamax.html (last visited August 10, 2016).
[23] Trazodone is an antidepressant medicine. *See* https://www.drugs.com/trazodone.html (last visited August 10, 2016).

6

On September 16, 2009, plaintiff underwent an overnight polysomnogram, which revealed an insignificant sleep disorder and mild snoring. (D.I. 11-1 at 37-46) On September 24, 2009, Dr. Varipapa reported that Gabapentin[24] helped plaintiff's pain symptoms, which worsened when plaintiff ran out of the medication. Dr. Varipapa noted that plaintiff would voluntarily continue using the CPAP machine as plaintiff believes that she sleeps better with it and gets headaches without it. Plaintiff reported that she was trying to get disability as she cannot stand or sit for any period of time. (D.I. 11-1 at 35-46)

### 2. Health history during the relevant period

On October 14, 2009, Dr. Varipapa reviewed the results of plaintiff's nerve conduction studies to evaluate for peripheral compression neuropathy, which revealed prolonged latencies consistent with median neuropathy in plaintiff's right wrist, as well as peripheral neuropathy. Dr. Varipapa's impressions were right carpal tunnel syndrome and peripheral neuropathy. (D.I. 11-1 at 33-34, 59-60) On October 28, 2009, plaintiff reported to Dr. Varipapa that she had constant numbness and tingling in her hands and was wearing bilateral wrist splints. Dr. Varipapa reported a normal gait and balance, grossly intact cranial nerves, and mild decreased sensation to vibration in the toes bilaterally. (D.I. 11-1 at 31-32) On January 26, 2010, plaintiff reported to Dr. Stephen Penny[25] ("Dr. Penny") that the wrist braces worsened her symptoms and that she was having trouble gripping and tended to drop things. Dr. Penny found "midline lower lumbar tenderness and bilateral lumbar paraspinal tenderness." He noted that

---

[24] Gabapentin is used in adults to treat nerve pain. *See* https://www.drugs.com/gabapentin.html (last visited August 10, 2016).
[25] With CNMRI: Neurology, Sleep Medicine, MRI.

7

her straight leg raise was negative; her Tinel's sign[26] was negative at both wrists; and

her gait was antalgic.  He ordered an MRI and told plaintiff to discontinue use of the

wrist braces.  On February 10, 2010, plaintiff underwent an MRI, which showed

"[i]ncreased epidural fat at L4-5 and L5-S1 associated with mild to moderate central

spinal stenosis at both of these levels, worse at L5-S1" and "[d]egenerative disk disease

at L3-4 and L4-5 without evidence of disk herniation, nerve root canal stenosis or

central spinal stenosis."  On February 15, 2010, Dr. Penny followed up with plaintiff,

who reported a limited ability to walk[27] and worsening pain when standing for 1-2 hours.

Dr. Penny opined that he did not feel plaintiff was a candidate for spinal surgery, but

referred plaintiff "in view of the severe refractory nature of her pain."  Dr. Penny

observed negative Tinel's sign at both wrists, normal upper and lower extremity

strength, and posterior thigh pain bilaterally at 45 degrees from a straight leg test.  He

recommended weight loss, including surgical options.  He prescribed Ultram[28] for pain.

(D.I. 11-1 at 25-30)

On February 23, 2010, Dr. Eric Schwartz[29] ("Dr. Schwartz") evaluated plaintiff's

wrist and hand pain.  For plaintiff's right wrist, Dr. Schwartz found that:

> The patient has some wrist pain.  The wrist range of motion is mildly
> limited in in dorsiflexion and volar flexion.  She is able to make a full fist
> but it is painful.  There are no palpable nodules at the base of the thumb
> or fingers and no triggering demonstrated.  The patient has no pain with
> basilar grind.  There is no Finkelstein's test.  Tinel's testing and direct
> compression test is negative.  The patient has numbness in the entire

---

[26] A tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb. *Merriam-Webster Medical Dictionary* (2016).

[27] She stated she could currently walk halfway through the mall before needing to sit down.

[28] Ultram (tramadol) is a narcotic-like pain reliever, used to treat moderate to severe pain. *See* https://www.drugs.com/ultram.html (last visited August 10, 2016).

[29] With Delaware Orthopaedics & Sports Medicine, PA.

8

hand.  She has no thenar atrophy.  The radial pulse is palpable.  There is
no neck pain and neck range of motion is normal.  There is no evidence
on exam of any radicular symptoms producing any hand numbness.

For plaintiff's left wrist, Dr. Schwartz found the same, with the exception that plaintiff

was able to make a full fist.  Dr. Schwartz noted that plaintiff tried bracing and was not

interested in physical therapy.  He opined that he was not convinced plaintiff's major

problem was resulting from carpal tunnel syndrome.  He recommended (and plaintiff

proceeded with) a cortisone injection in the right wrist.  (D.I. 11-1 at 63-66)

On April 14, 2010, Dr. Bhavin Dave[30] ("Dr. Dave") evaluated plaintiff for

abdominal pain, diarrhea, and difficulty swallowing.  He prescribed Omeprazole.[31]  (D.I.

11-1 at 23-24)  On April 20, 2010, plaintiff underwent an exercise myocardial perfusion

which found no stress induced myocardial ischemia.  Dr. Patel noted that plaintiff had

poor exercise tolerance, but normal blood pressure and heart rate response with no

exercise-induced chest pain.  (D.I. 11-1 at 80)  After continued treatment with her

various care providers, on July 23, 2010, plaintiff followed up with Dr. Dave and

reported that her dysphagia had resolved.  She still had four to five bowel movements

per day with occasional gas, bloating, and indigestion.  (D.I. 11-2 at 25)  On October 21,

2010, Dr. Patel noted that plaintiff was complying with dietary changes, but not with

exercise in the management of her diabetes.  He also reported that plaintiff described

her numbness in the feet as moderate and plaintiff's gait and station were normal.  (D.I.

11-1 at 145-48)  Plaintiff's care providers continued to counsel her on weight loss and

---

[30] With GI Consultants Dover.

[31] Omeprazole (Prilosec, Zegerid) decreases the amount of acid produced in the
stomach and is used to treat symptoms of gastroesophageal reflux disease and other
conditions caused by excess stomach acid.  *See*
https://www.drugs.com/omeprazole.html (last visited August 10, 2016).

9

smoking cessation. (See, e.g., D.I. 11-2 at 3-4, D.I. 11-1 at 139-44)  On January 5, 2011, Dr. Dave followed up with plaintiff and noted that her diabetes was "out of control." (D.I. 11-2 at 22-24)  On January 19, 2011, Dr. Patel again noted that plaintiff was not complying with exercising, but had a normal gait and station. (D.I. 11-2 at 99-102)  On February 16, 2011, Dr. Dave reviewed plaintiff's diet and asked her to avoid certain foods that she was eating to help with her bloating. (D.I. 11-2 at 14-16)  On February 28, 2011, Dr. Patel followed up with plaintiff regarding her hypertension, hyperlipidemia, diabetes, and lower back pain.  Plaintiff continued to report low back pain radiating to her thighs and relieved by heat.  Dr. Patel noted normal gait and station and adjusted certain of plaintiff's medication. (D.I. 11-2 at 95-98)

On March 14, 2011, plaintiff underwent right carpal tunnel release surgery by Dr. Glen Rowe.[32] (D.I. 11-1 at 83)  She began physical therapy in April 2011 and on May 9, 2011, plaintiff reported 50% improvement, but her wrist burned with a lot of use. (D.I. 11-1 at 116-18)  On September 6, 2011, plaintiff's care provider noted that her perceived improvements were 75% since beginning physical therapy. (D.I. 11-1 at 87)

On April 4, 2011, plaintiff reported to Dr. Patel that she had vertigo for six hours and lightheadedness precipitated by position change, head turning, and standing suddenly.  Dr. Patel opined that the symptoms were likely secondary to hypotension. He recommended that plaintiff discontinue Vasotec[33] and increasing fluids. (D.I. 11-2 at 86-88)  On April 20, 2011, plaintiff reported that her symptoms were decreasing. (D.I. 11-2 at 84-85)

---

[32] With Bayhealth Medical Group Orthopaedic Surgery.
[33] Vasotec is used to treat high blood pressure (hypertension) in adults. See https://www.drugs.com/vasotec.html (last visited August 10, 2016).

On April 29, 2011, plaintiff returned to Dr. Penny complaining of numbness in the lower legs and a loss of sensation circumferentially from the midcalf distally with symptoms worsening at night.  Dr. Penny found the strength in plaintiff's legs normal, with normal muscle tone, but the vibration sensation diminished in both feet.  Plaintiff's gait was antalgic.  Plaintiff had no pain with range of motion of the hips, knees, or ankles.  Dr. Penny assessed plaintiff with paresthesia and listed potential causes as peripheral neuropathy or lumbar spinal stenosis, previously demonstrated on plaintiff's lumbar spine MRI and related to increased epidural fat.  Dr. (D.I. 11-1 at 91-93)  On May 6, 2011, Dr. Penny reported that plaintiff had undergone an incomplete nerve conduction study as plaintiff requested that the study be terminated early as she could not tolerate it.  He noted that the limited findings "suggest the presence of at least a sensory neuropathy."  (D.I. 11-1 at 90)  Plaintiff returned to Dr. Patel on June 24, 2011, who noted that plaintiff had a normal gait and station.  Plaintiff complained of allergic rhinitis, with congestion and cough.  Dr. Patel recommended plaintiff continue Loratadine and Pseudoephedrine.[34]  (D.I. 11-2 at 80-83)

In August and September 2011, plaintiff consulted with Bayhealth Medical Group Orthopaedic Surgery and received a prescription for physical therapy post carpal tunnel surgery and for Norco.[35]  (D.I. 11-1 at 117-18, 129-130)  Dr. Jonathan Kates ("Dr. Kates") completed a physical residual functional capacity questionnaire after he met

---

[34] Loratadine and pseudoephedrine is a combination medicine used to treat sneezing, runny or stuffy nose, and other symptoms of allergies and the common cold. *See* https://www.drugs.com/mtm/loratadine-and-pseudoephedrine.html (last visited August 10, 2016).

[35] Norco contains a combination of acetaminophen and hydrocodone.  It is used to relieve moderate to moderately severe pain. *See* https://www.drugs.com/mtm/norco.html (last visited August 10, 2016).

11

with plaintiff on September 29, 2011 and she "mentioned her back." Dr. Kates diagnosed plaintiff with lumbar radiculopathy and neuropathy causing pain, limited flexion and extension, and difficulty ambulating. He characterized the pain as lower back pain with radiation to both lower extremities and noted that plaintiff was tender to palpitation over the right lower lumbar area. As to side effects from medications, Dr. Kates noted "Norco - drowsiness." Dr. Kates concluded that plaintiff's impairments were reasonably consistent with her symptoms and functional limitations. Plaintiff's pain or other symptoms seldom interfere with attention and concentration. Plaintiff was capable of low stress jobs, as physical stress exacerbates her back condition. Plaintiff could walk less than one block without resting or severe pain. Plaintiff could continuously sit for 1 hour; stand for 10 minutes at one time. In an 8 hour work day, plaintiff could sit for at least 5 hours, stand/walk for less than 2 hours, and would need 7 minute walking breaks every 60 minutes. Dr. Kates further concluded that plaintiff did not need a job permitting shifting positons at will from sitting, standing, or walking. She would need to take unscheduled breaks twice for 5-7 minutes during an 8 hour work day. She did not need her legs elevated during prolonged sitting. Plaintiff needed a cane or other assistive device for occasional standing/walking. Plaintiff could occasionally lift and carry less than 10 pounds. She had no significant limitation in doing repetitive reaching, handling or fingering. She could never stoop or crouch. Dr. Kates estimated that plaintiff would be absent about once a month because of her impairments. (D.I. 11-1 at 131-134)

On October 14, 2011, Dr. Patel noted that plaintiff's intermittent dizziness over the last weeks was associated with an ear infection, headache and nausea. As to

plaintiff's diabetes, Dr. Patel reported that plaintiff was not compliant with exercise or diet. He noted normal gait and station. (D.I. 11-2 at 73-76) On October 21, 2011, Dr. Varipapa reported that plaintiff's brain MRI showed several areas of increased signal that were nonspecific in nature. (D.I. 11-1 at 89) Plaintiff returned to Dr. Penny on October 28, 2011, reporting difficulty walking as of three months ago. Plaintiff was using a cane and denied any falls. Dr. Penny found normal coordination and movement without difficulty. Dr. Penny recommended an aerobic exercise program at home to help with lower back pain and that plaintiff consider physical therapy in the future. (D.I. 11-2 at 148-52) On December 30, 2011, plaintiff reported that her walking difficulties were getting worse and she was using a cane. Dr. Varipapa found plaintiff's strength intact. The care providers advised plaintiff to start a regular walking program. (D.I. 11-2 at 143-47)

On February 16, 2012, Dr. Patel noted that plaintiff's diabetes self-management included dietary modification with home glucose testing three times daily. Plaintiff reported numbness located in the right foot, right upper extremity, left foot, and left hand. (D.I. 11-2 at 65-67) On February 28, 2012, Dr. Patel completed a physical residual functional capacity questionnaire, diagnosing plaintiff with neuropathy, back pain, and carpal tunnel syndrome, causing chronic pain and numbness in her hands and feet. He characterized plaintiff's pain as severe burning pain to her feet, and decreased sensation in her hands. He stated that plaintiff had "pain to feet on exam, back." Moreover, her medications caused fatigue and dizziness. He opined that plaintiff's pain and other symptoms would frequently interfere with attention and concentration. Dr. Patel concluded that plaintiff could walk less than a block without

13

resting or severe pain. She could continuously sit for 45 minutes and continuously stand for 20 minutes. In an 8 hour work day, plaintiff could sit for less than 2 hours and stand/walk for less than 2 hours. She would need to include periods of walking every 30 minutes for 10 minutes. She would need a job which permits shifting positions at will from sitting, standing, or walking. She would need unscheduled breaks every 10 to 15 minutes and would need to rest for 20 to 30 minutes before returning to work. With prolonged sitting, plaintiff would need to elevate her legs more than 50% of the time at a level higher than her waist. Plaintiff does not need a cane or other assistive device for occasional standing and walking. She can occasionally lift and carry up to 10 pounds. Plaintiff has significant limitation in doing repetitive reaching, handling, or fingering; can use her hands to grasp, twist, and turn objects 10% of the time; use her fingers for fine manipulation 10% of the time; and use her arms for reaching only 10% of the time. She can stoop and crouch 5% of the time. Dr. Patel estimated that, on average, plaintiff would miss more than 4 days a month from work because of her impairments. (D.I. 11-2 at 103-106)

Plaintiff reported continuing symptoms of headaches, gait difficulties and low back pain to Dr. Patel and Dr. Varipapa in April, May, and August 2012. (D.I. 11-2 at 60-62, 133, 138-42) On August 21, 2012, plaintiff described that her diabetes was improving. Dr. Patel noted that plaintiff had "normal strength in all extremities and normal range of motion, abnormal gait (slow, with cane)." (D.I. 11-2 at 54-56) On September 25, 2012, plaintiff underwent a neuromuscular exam revealing "normal motor tone, decreased bulk and strength, with right [side] greater than left. Pulses and [deep tendon reflexes] are intact and symmetric. There was positive Tinel's on the

14

right." The care providers noted right carpal tunnel syndrome and peripheral

neuropathy secondary to diabetes. (D.I. 11-2 at 131-37)

On October 25, 2012, consultative physician Dr. William Barrish ("Dr. Barrish")

completed a range of motion chart and provided the following statement:[36]

> Range of motion is limited in the lumbar spine as well as the ankles.
> Strength is limited in the hands as well as the distal lower extremities. At
> this time, I feel the patient could sit for 6 to 8 hours per day although
> frequent position changes would be helpful. Standing and walking could
> be done less than 1 hour per day. Lifting and carrying could be done with
> 0 pounds frequently and 5 pounds occasionally. Grasping and handling
> could be done occasionally with limitations in the right hand due to carpal
> tunnel syndrome and residual symptoms status post carpal tunnel release.
> Bending, crawling, crouching and stooping should be avoided. Gait is
> significantly slowed with a shuffling gait pattern and ataxia secondary to
> neuropathy. The claimant is able to drive but is limited in terms of
> distance due to recurrence of back pain.

(D.I. 11-1 at 94-103) Dr. Barrish completed a medical source statement form on

November 1, 2012, indicating that plaintiff needed a cane to ambulate, that it was

medically necessary, and she could walk less than 10 feet without using it. Dr. Barrish

concluded that plaintiff could lift and carry only up to 5 pounds occasionally because of

her lower back pain and neuropathy. She could stand or walk for 5 minutes and sit for

30 minutes at one time. She could sit for 8 hours and stand or walk for 30 minutes each

in an 8 hour work day. He reported that she could only use her right hand occasionally

for reaching overhead, handling, fingering, feeling, pushing, and pulling because of her

carpal tunnel syndrome. Likewise, she could only use her feet occasionally for

operation of foot controls because of neuropathy. Dr. Barrish concluded that plaintiff

could never climb stairs, ramps, ladders, or scaffolds, stoop, kneel, crouch, or crawl and

---

[36] He indicated that he was not provided a medical source form.

15

could occasionally balance because of lower back pain and neuropathy. He noted

certain environmental limitations – no exposure to unprotected heights, occasional

exposure to moving mechanical parts, and occasional operation of a motor vehicle. He

indicated that the limitations he found had been present for 2 years. (D.I. 11-1 at 119-

25)

On October 26, 2012, Joseph Keyes, Ph.D. ("Dr. Keyes") completed a physical

functioning assessment and clinical psychological evaluation. Dr. Keyes concluded that

plaintiff has an adjustment disorder, with depressed mood and learning disorder. More

specifically,

> [p]laintiff is able to understand, remember and carry out simple
> instructions and tasks. She has difficulty with complex instructions and
> tasks because of her limited abstract thinking and learning disorder. She
> is capable of responding appropriately and adequately to coworkers,
> supervisors and the public. She can follow simple standard/usual work
> situations (attendance, safety, basic procedures). She has difficulty with
> complex work routines and situations because of her learning disorder and
> concrete thinking. Plaintiff can deal with typical and usual type changes in
> basic work routines.

Dr. Keyes assessed plaintiff with a Global Assessment of Functioning ("GAF")[37] at 60.

He also indicated that plaintiff had been using a cane to walk for approximately 6

months and walked with a slow gait. (D.I. 11-1 at 104-15)

---

[37] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall
judgment of a person's psychological, social, and occupational functioning on a scale
devised by the American Psychiatric Association. American Psychiatric Association,
*Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-
IV-TR*). A GAF of 31-40 indicates "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major
impairment in several areas, such as work or school, family relations, judgment,
thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to
work . . .)." A GAF of 41-50 indicates "[s]erious symptoms (e.g.. suicidal ideation,
severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF of

On November 2, 2012, plaintiff consulted Dr. Varipapa for an urgent appointment due to a headache. She received an injection, which gave her complete relief within 10 minutes. Plaintiff had a normal gait and was able to stand without difficulty. (D.I. 11-2 at 119-125) On November 29, 2012, plaintiff reported to Dr. Patel's colleague that her "asthma has been worsening" and she was short of breath. (D.I. 11-2 at 47-50) Plaintiff continued to report symptoms including dizziness and trouble sleeping to Dr. Patel in December 2012. On December 13, 2012, plaintiff weighed 220 pounds. (D.I. 11-2 at 41-46) On February 21, 2013, plaintiff consulted Jeffrey Barton, DPM ("Dr. Barton") regarding a black line on her toe that started about one month before. She also reported constant pain in her feet and ankles. Dr. Barton noted plaintiff's vibratory sensation was absent below the ankles. Plaintiff had normal range of motion and muscle strength. He diagnosed diabetic neuropathy and discussed foot care with plaintiff. (D.I. 11-2 at 28-29) On March 6, 2013, Dr. Patel followed up with plaintiff and noted that she had not been compliant with exercise or diet changes. Plaintiff had normal strength in all extremities and normal range of motion, however, her gait was abnormal (slow, with cane). Dr. Patel classified plaintiff's long-term asthma as "mild persistent," and counseled plaintiff on quitting smoking. (D.I. 11-2 at 30-33)

## C. Administrative Hearing

### 1. Plaintiff's testimony

---

51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

Administrative hearings were held on July 29, 2010, and May 21, 2013. Plaintiff appeared (represented by counsel) and testified as follows.[38] (D.I. 10-2 at 36-95) Plaintiff was born on September 13, 1962, and was forty-seven and fifty[39] at the time of the hearings, respectively. (Id. at 39-40, 76) Plaintiff is 5'4" tall and weighed 260 lbs in 2010 and 243 in 2013. (Id. at 40, 76) She is right-handed. (Id. at 40) She divorced in 1986-87 and has one child over eighteen who does not live with her. (Id. at 40-41, 51) She has a driver's license, but drives only as she needs to. (Id. at 41) She completed high school. (Id. at 41) She lives with her boyfriend, who works as a machine operator and does not have any children. (Id. at 40-41, 54)

Plaintiff drew unemployment in 1980. (Id. at 54) She worked as a mail clerk opening mail at Client Logic from 1998-2004. The working hours varied depending on the work load. (Id. at 42-43, 59) She worked at Royal Farms as a deli clerk from the summer of 2004 to 2006. (Id. at 42) She worked part time at the Dollar Tree as a cashier for almost three years, from 2006 to 2009. She worked five hours, three to four days a week. She was fired for "giving merchandise away." (Id. at 41-42) She only worked part time in 2009 because that is all that was available and that is "all [she] could stand." (Id. at 51-52) She testified that she would not have been able to work full time because of her back. She described having problems with a deteriorating disk in her lower spine and having received a "shot with silicone and a bunch of needles, and [the doctor] packed [her] disk." She had back labor with her daughter in 1988, but has not injured her back or had surgery. (Id. at 52) Plaintiff has not worked since February

---

[38] To the extent plaintiff's testimony is duplicative, the court cites to the first hearing transcript.

[39] Plaintiff testified she was fifty-one.

18

2009, because of "neuropathy of the feet and hands," as well as "lower back problems."
She alleges that she cannot sit or stand. Plaintiff had an "ongoing back problem," which
got worse. She testified that her "feet stay numb," and she "can't feel [her] feet at all."
She also cannot feel her hands and cannot tell "how hot water is." (*Id.* at 43) In 2013,
she testified that she has rheumatoid arthritis in her spine (diagnosed four or five years
ago), which causes pain in her lower back. (*Id.* at 82)

She takes a number of medications[40] and reports being very tired in the
afternoon as a side effect. (*Id.* at 44-45) In 2013, plaintiff testified that she did not have
any side effects from her medicines. (*Id.* at 85) Plaintiff has sleep apnea and uses a
CPAP machine. (*Id.* at 44) She is "up and down all night long." (*Id.* at 50) She uses
the CPAP machine every night, but it does not take care of the sleep apnea. (*Id.* at 53)
Her high blood pressure is controlled. (*Id.* at 54) When asked if she recalled taking a
stress test in February 2010, plaintiff responded that it had been several years and she
did not recall. (*Id.* at 54) She has been taking a water pill for her swelling for several
years, but it does not help. Her doctor keeps increasing it. The swelling is from walking
around all day and occurs when she goes to bed. She sleeps with her feet elevated.
(*Id.* at 55)

Plaintiff is being treated with medication from her primary care doctor for her
depression. She does not know what she takes for depression, but has been taking it
for about eight months and it helps. She described her condition as "get[ting] upset . . .

---

[40] Gabapentin, Tramadol, aspirin for pain; Loratadine for allergies; Enalapril for high
blood pressure; Fortamet and Glimepiride for diabetes; Ibuprofen for headaches;
Vastatin for high cholesterol; Furosemide for fluid retention; Klor-Con for potassium;
Skelaxin for muscle relaxation; and Alprozalam for her stomach. In 2013, plaintiff
testified that she did not take a pill for her blood pressure. (D.I. 10-2 at 83)

[a]bout things in general," like having no money and not being able to do anything. She is worried about her bills as she cannot work. Her "fiancé throws it . . . in [her] face every day." (Id. at 56) In 2013, plaintiff testified that she takes Cymbalta for her depression, which also helps with her neuropathy. She does not see any mental health doctors. She described her symptoms as occasionally sitting and crying. (Id. at 85-86)

Plaintiff is also under the care of a gastroenterologist for diverticular disease, which plaintiff refers to as "cancer of the colon." She states that she is constantly nauseous and suffers from ongoing diarrhea. Plaintiff is under the care of an endocrinologist for her diabetes. (Id. at 45) She was hospitalized in 2008 for her sugar. When asked if she recalled that she was told that she had "peripheral neuropathies and . . . hypokalemia and . . . other related problems to . . . diabetes," she agreed that Dr. Varipapa, a neurologist, diagnosed her with peripheral neuropathy in March of 2009. (Id. at 44) She has gone to the emergency room once or twice for her sugar in the last year or two, but did not stay overnight. (Id. at 54-55) In 2013, plaintiff testified that she had not been hospitalized overnight since the first hearing. (Id. at 86)

Plaintiff was diagnosed with diabetes about a year or two years ago. She has always been heavy. She diets, but still has problems with her sugar. She takes two pills in the morning, an insulin shot in the afternoon, and two pills at night. She has been on insulin for about two months, but is still having trouble with her sugar. Her father had diabetes when he had cancer. (Id. at 52-53) In 2013, plaintiff testified that she takes pills for her diabetes, but is not on insulin as she no longer has the strength to push the needle. Her doctor, therefore, increased her pills. (Id. at 78-79) Plaintiff smokes; when stressed out, she smokes about half-a-pack a day. She does not drink

and has not since she was young.  Plaintiff also diets and likes to eat salads, which has helped her diabetes.  Her weight goes up and down.  (Id. at 84-86)

Regarding her "neuropathies," she has problems with her hands and feet and uses a cane at the suggestion of her doctor as she "cannot hold [her] balance."  (Id. at 46-47)  In 2013, plaintiff testified that she needs the cane to balance and walk.  Dr. Patel prescribed her cane about a year ago.  She can only walk for about five minutes at a time.  (Id. at 78-79, 85)  Her hands are numb and at nighttime, she gets "real sharp shooting pains."  (Id. at 48)  She cannot open a jar or sit and write a letter by hand.  (Id. at 48-49)  In 2013, plaintiff testified that her neuropathy "has now moved from [her] feet to [her] hand," and is very painful on a daily basis.  She had carpal tunnel surgery in 2011 and her right hand is worse than it was before the surgery.  She is unable to hold anything and drops everything with any kind of weight.  She also has tremors in her hand as well as the neuropathy.  She cannot type or write for any period of time.  She also stated that her neurologist treats her neuropathy and migraine headaches.  Plaintiff further testified that her foot doctor does her toenails and checks her feet for redness.  (Id. at 77-79)

Plaintiff can walk continuously or stand for "maybe an hour" before needing a break.  Her lower back bothers her sitting and she can sit continuously for "an hour or two."  (Id. at 47-48)  After sitting for such time, she "move[s] a little bit" and then lays on her side for about an hour, before she can sit upright again.  (Id. at 48)  In 2013, plaintiff testified that she could walk "maybe like five minutes" with the cane.  The ALJ asked the plaintiff: "[W]hat about standing still?  Is that about the same?  Is that better?"  Plaintiff responded, "[y]es."  She can only sit for about five minutes, after which she needs to lay

down or lean to the side. (*Id.* at 79-80) She testified that to work she would need the cane and could not use her hands. (*Id.* at 81)

She is able to dress and do her hair, because she has a simple hairdo and uses a large brush. Her doctors have not placed a lifting restriction on her. She testified that she uses a shopping cart to carry a gallon of milk to her car – putting it from the shelf into the cart and then from the cart into the car. (*Id.* at 49-50) In 2013, plaintiff testified that she cannot lift anything. (*Id.* at 80)

Plaintiff currently does all the housework, but it takes her all day to clean, as she does a little and then has to rest. (*Id.* at 50) In 2013, plaintiff testified that she does what household work she can, which is not very much, and her boyfriend does the rest. (*Id.* at 80) She visits with her mother and sister. (*Id.* at 50) In 2013, plaintiff testified that she visits her boyfriend's cousin. She does not socialize or go to church. She gets along well with her boyfriend. (*Id.* at 81, 86) Her typical day consists of waking, taking her medications, taking her boyfriend to work, coming home, taking a nap because she is exhausted, getting up, doing the laundry, and hanging the clothes out. She is home all day because of her diabetes and insulin dependence. (*Id.* at 50-51) In 2013, plaintiff testified that she just stayed home. (*Id.* at 81) She receives general assistance and her boyfriend pays most of their bills. (*Id.* at 51) In 2013, plaintiff testified that she receives about $90 per month in general assistance. She also receives food stamps. Her boyfriend is buying the house in which they are living for $65,000 and putting her name on it. He put down $25,000 and the mortgage is $300 per month. (*Id.* at 81-82)

## 2. VE's testimony

22

At the first hearing, the ALJ asked the VE, "you heard Ms. Moulton speak of her past work and you have seen the file. Can you tell me what she did, generally?" The VE responded:

> Yes, she has held three jobs, basically, three, four jobs. Cashier, sort of customer service stock clerk. . . . Cashier is 221.462-010, and that's light work with an SVP of 2, which is unskilled work. . . . Stock clerk. . . . 299.367-014, and that is heavy work with an SVP of 4. . . . Customer service helper [is 637.684-010] and it's basically what she did, and it was heavy work, and with an SVP of 4.

The ALJ asked the VE if there were any transferrable skills. The VE responded: "Yes. . . . Basically, operating cash register, making change, dealing with customers. Selling things and obtaining cash or credit cards." After some discussion regarding plaintiff's work as a mailroom clerk, the VE concluded that the work was "substantial. . . . So, it's mail order clerk, and the DOT is 249.362-026. . . . And it's with an SVP of 4, and it's sedentary work." After some discussion regarding plaintiff's work as a deli clerk, the VE testified that: "The DOT number is 331.374-014, it's light work, with an SVP of 3. The claimant described it as heavy work, because she had to carry 80-pound boxes of chicken." (D.I. 10-2 at 57-61)

The ALJ then posed the following question:

> I'd like for you to assume, if you would, a person who is 46 years of age on her alleged onset date, has a 12th grade education, right handed by nature, past relevant work as just indicated. Suffering from various impairments, including degenerative disk disease [in the lower back].
> . . .
> And she was diagnosed with diabetes several years ago. Recently started taking insulin, has high blood pressure that is controlled by her medication. She has obesity. Today she weighs 260 pounds and some sleep apnea and some mild depression, sees no doctors for, but takes medication.
> She does have pain and discomfort associated with her conditions, mild depression with neuropathy. And some edema on occasion. Somewhat relieved by her medications, however, without significant side

23

effects, but she indicates she gets tired at the end of the day from one or a combination, and if I find she needs to have simple, routine, unskilled jobs, Ms. Rosen, SVP-1 or 2, low concentration, low memory, is mildly limited in her ability to perform her ADLs and to interact socially and to maintain her concentration, persistence and pace.  And if I find she can lift 10 pounds frequently, 20 on occasion, can stand for 30 minutes, sit for 30 minutes consistently.

However, on an alternate basis, eight hours a day, five days a week, she would have to avoid heights and hazardous machinery.  She uses a cane to ambulate.  Temperature and humidity extremes, stair climbing, ropes and ladders and jobs that would not require fine dexterity and manipulation due to some numbness that she incurs in her hands on occasion.

She's been diagnosed as having some neuropathy.  Jobs that would require little writing ability, but would seem to be able to do some sedentary and light work activities.  With those limitations, can you give me jobs or not with those limitations?

(*Id.* at 61-62)  The VE responded and the ALJ posed further questions as follows:

A.  There are some jobs, Your Honor, except for the medication issue, if that would be - -

Q.  She indicates she gets tired at the end of the day.

A.  Yeah.  Okay.  There are some - - there's surveillance system monitor.

Q.  At light?

A.  That's sedentary.

Q.  Sedentary.

A.  With an SVP of 2.  And order clerk, food/beverage, sedentary with an SVP of 2.  Mail order clerk, sedentary with an SVP of 4.  But she did it already.  She did it in the past.  There's some - - also some light jobs, dispatcher.

Q.  [D]o you have any numbers for those jobs?

A.  Yes.  Okay.  The mail order clerk is the same one I gave before, 249 - -

Q.  You say that has an SVP rating of 4?

A.  Of 4, but she did this before.

24

Q. I know, but if she can't - -

A. It's the same - -

Q. - - do it now [inaudible] SVP, we couldn't use that number.

A. Okay. So, the others, order clerk, food/beverage, is 209 - - the DOT - - 567-014. It's sedentary with an SVP of 2. There are 1,010 in the Delaware area and nationwide, 248,030. The surveillance monitor is - - the DOT is 379.367-010, and there are 50 in the Delaware area and 9,100 nationwide.

. . .

Q. All right. What about another job at the sedentary level with those limitations if you can come up with it.

A. Addresser, envelope.

Q. Is there much writing associated with that or not?

A. No. There is, basically, addressing envelopes and it's usually with labels.

Q. All right.

A. And 209.587-010. It's sedentary, with an SVP of 2. There are 2 - - there's 80 in Dover, 270 in Delaware and 128,010 nationwide.

Q. Any light jobs?

A. Yeah. Marker retail.

. . .

A. 209.587-034. It's light with an SVP of 2[and would take u]p to 30 days [to learn]. . . . From simple demonstration to 30 days. . . . [I]n the Delaware area, there are 6,190. And nationwide, 1,873,390.

Q. Any other light jobs?

A   Did I say dispatcher? . . . Maintenance, and that's - - the DOT is 239.367-014. That's the SVP is 3. And in the Delaware area, it's 660, and nationwide, 193,210.

Q. And would all those jobs allow her to sit/stand on a basis that I indicated?

25

A.  Pretty much.  It would - - she could change positions.

Q.  And would the sit/stand, exertional skill level of all those jobs, it will be in line with the - - what we know to be the Dictionary of Occupational Titles or not?

A.  That's correct.  This is all the information is from the Dictionary of Occupational Titles.

Q.  Does it allow for a sit/stand option in the Dictionary of Occupational Titles?

A.  Of this - - I'm sorry.

Q.  Do those jobs allow for the sit/stand in the - -

A.  It doesn't specify.

Q.  Okay.

A.  But usually sedentary jobs are, you know, up to like two hours sitting, standing.

Q.  So, you are giving me that by your vast experiences of a vocational expert?

A.  That is correct.

Q.  And would she be able to do any of her past work in your opinion or not?

A.  The mail clerk room is a possibility.

Q.  What is the SVP rating of that?

A.  I said 4.  Yeah.

Q.  But she can only do a 3 or 2.  She wouldn't be able to do that job.

A.  Yeah.  Then she couldn't do that.

Q.  Okay.  The assessments you made of [her] past work, do you see any conflicts as she performed it?  You indicate that one of them, the deli clerk, that she may have done it at the heavy level rather at the light.

A.  That is correct.

Q. Is that the only conflict you saw?

A. Pretty much, yes. Yeah. Everything else seems to go with what's in the Dictionary of Occupational Titles.

(*Id.* at 63-67)

On cross-examination, plaintiff's counsel asked the VE to describe the

"addresser job" further. After some discussion, the VE agreed that the job required

"fingering," and would not survive the limitations imposed by the ALJ. The ALJ then

inquired if there were another job that "doesn't require too much fine manipulation and

dexterity." The VE responded: "Information clerk[, DOT 237.367-018]. It's light, SVP-2.

. . . And in the Delaware area there is - - well, in the Dover area, there's 440. And

nationwide, 1,097,610." Plaintiff's counsel then asked:

Q. And [if] a person were limited, say, to sedentary work activity, and they had a restriction of no fine manipulation, and they need a cane for balance. Would they be able to do any of the jobs that you mentioned or any other type of work?

A. The surveillance system monitor probably.

Q. Okay. But the other jobs you are saying would be eliminated?

A. Yeah. If you use that. That would eliminate - -

Q. Okay. Now, going back to the hypothetical that was given to you where there was a 30 - - there was a sit/stand option, so, every 30 minutes this person - - we [a]re not talking about your regular lunch break in the morning and afternoon break.     We are talking about, 30 minutes you are sitting, 30 minutes you are standing. You are alternating between the two. And the purpose of needing to alternate is because of the condition that you suffer from. So, you are alternating basically due to pain. So, in between the alternation, say, you need like a five or a ten-minute break where you are going to be off task because of pain. Would a person - - would such a person be able to work, in your opinion?

A. How many breaks?

27

Q. That's the sit/stand option, every half-hour.

A. Every half-hour. No, that would be a problem. Usually, there are two breaks. One in the morning, and one in the afternoon, plus lunch breaks. If there are excessive breaks, that might be a problem.

(*Id.* at 67-71)

At the second hearing, the ALJ asked the VE: "You heard Ms. Moulton kind of

speak of her past work and those two jobs. Can you tell us what she did?" The VE

responded:

Yes, Your Honor. According to the record, she was a cashier in the retail industry. The DOT number is 211.462-010, the SVP number is 2, it's unskilled, exertional level light. Although, according to the record, the claimant performed it at medium. The record also indicates that she was a deli clerk. According to the DOT, that's called a deli cutter/slicer. The DOT number is 316.684-014, with an SVP number 2, it is unskilled, exertional level light. Although, according to the record, the claimant performed the position at heavy. The last position in the record, Your Honor, she was a mailroom clerk for a distribution company. The DOT number is 209.687-026, with an SVP Number 2, unskilled, exertional level light. However, according to the record, the claimant performed the position at sedentary.

The ALJ asked if there were "[a]ny transferrable skills" and the VE responded "[n]o,

Your Honor, they are all unskilled." (*Id.* at 87-88)

The ALJ then posed the following question:

[A] person, who is 46 years of age on her onset date, has a 12th grade, past relevant work as indicated. Right handed by nature, suffering from various impairments, including degenerative disk disease due to arthritis and some diabetes. It is fairly well controlled by her meds. And she has high blood pressure that is controlled, sleep apnea. She uses a CPAP machine and some depression, but she sees no doctor for her depression, takes some medicine for it. And all of these things are somewhat relieved by her medications without significant side effects.

She also has some obesity, weighs 243 pounds, without any side effects from her medication. And I find that she needs to have simple, routine, unskilled jobs. SVP 1 or 2. Is able to attend tasks and complete schedules. Low stress, low concentration, low memory level jobs, and by that, I mean, no pace work, production pace work or only two-step tasks.

Jobs that have little decision making or changes in a work setting or judgments to do the work.

And if I find she can lift ten pounds frequently, twenty on occasion, can stand for 15, 20, 30 minutes, sit for 30 minutes consistently on an alternate basis, however, 8/5 or at will. Need[s] to avoid heights and hazardous machinery, and due to her carpal tunnel syndrome, jobs that would not require fine dexterity or manipulation except on an occasional basis in that right upper extremity. And jobs that have little writing and reading ability.

Stair climbing, avoid stair climbing, but would be able to do some light work activities. Can you give me jobs such a person could do?

The VE responded that:

The first position is called a laundry folder. . . . And one can sit/stand at will. The DOT number is 369.687-018. The SVP number, it is 2, unskilled, exertional level light. On a national level, there are 210,000 positions, and on a local level, there are 200. The next position, Your Honor, is called a retail marker, . . . The DOT number is 209.587-034, with the SVP number 2. It is unskilled, exertional level light. On a national level, there are 1,780,000 positions. And on a local level, there are 300. The next position, Your Honor, is called an information clerk. The DOT number is 237.367-018. The SVP number is 2, unskilled, exertional level light. On a national level, there are 109,000 positions and on a local level, there are 300. And all these positions are sit/stand at will.

The ALJ questioned the VE further as follows.

Q  And would the sit/stand exertional skill level with all those jobs you enumerated line up with the criteria in the DOT?

A  Well, the DOT does not address the sit/stand option, but that is based on my professional background as a vocational expert, Your Honor.

Q  And with those limitations and your opinion, would she be able to do any of her past work?

A  Well, with the cashier, one could do that. It is an SVP-2. It is light. Yes, Your Honor.

Q  And you've already indicated she may have done some of that past work a little differently than it's done in the national economy?

A  Yes, according to the claimant, according to the record, she performed the cashier position at a medium exertional level, but according to the DOT, that's usually performed at light.

(*Id.* at 88-91)

On cross-examination, plaintiff's counsel asked the VE for "the manipulative requirements for" "the cashier position that you were saying would have been with the limits of the first hypothetical."  The VE responded that "the reaching, handling and fingering, that is frequently."  Plaintiff's counsel stated that she "understood the hypothetical to say no fine dexterity or manipulation, and it said only occasional use of the right upper extremity."  The VE agreed and stated that "the cashier [position], with the handling, because that is frequently.  Some cashier positions, they differ, but the number that I'm given you with the DOT, that is frequent."  The VE agreed that plaintiff could no longer perform that job. (*Id.* at 91-92)

Referring to the consultative examination with Dr. Barrish, plaintiff's counsel questioned the VE regarding whether "a person with such limitations would be limited to a limited range of sedentary work activity."  The VE responded that "it's less than full time, so that would not – a person would not be able to do sedentary work with these conditions. . . . Your Honor, because it's – according to the record, she could only do the job less than full time.  Therefore, it would preclude any type of sedentary positions." Referring to the evaluation by Dr. Patel, plaintiff's counsel asked "[i]f one had limits as specified in that evaluation, would you say that person could work?"  The VE responded that "the person could not work.  I'm looking at 15-C, the person could only sit less than two hours within an eight-hour day, and stand less than two hours in an eight-hour day. Therefore, that would preclude any type of employment, because it's less than part time."  Plaintiff's counsel then asked:

[W]hat would you say if the person was, say, limited to lifting and carrying about five pounds.  They could only stand and walk for about two hours in an eight-hour workday, total, whether it's alternating or not.  . . .  But total, and then six hours maybe sitting if they were able to.  But say they were only able to occasionally use their hands for handling and fingering.

The VE responded that "the person couldn't do any work.  Again, it would be less than

full time.  It's even less than part-time employment."  Plaintiff's counsel then asked:

Q  No, I said two hours total standing and walking, six hours sitting.
A  Within an eight-hour day.
Q  Yes.
A  So, that would be less than a full day work, so it would be less than full time.  Therefore, the person could not perform any type of work.
Q  Okay.  All right.

(D.I. 10-2 at 92-95)

### D.  The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VEs, the ALJ

determined plaintiff was not disabled during the relevant time.  The ALJ's findings are

summarized as follows:[41]

1.  Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since the alleged onset date of October 14, 2009 (20 C.F.R. §§ 404.1571 et seq.).

3.  Plaintiff has the following severe impairments:  Degenerative disc disease, right carpal tunnel syndrome, diabetes, and depression (20 C.F.R. 404.1520(c)).

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

---

[41] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

5.  After careful consideration of the entire record, plaintiff has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) with the ability to lift 10 pounds frequently and 20 pounds occasionally, stand for 15-30 minutes and sit for 30 minutes, or at will, consistently, on an alternate basis, eight hours per day, five days per week.  Plaintiff needs to avoid heights and hazardous machinery and stair climbing.  She can perform jobs that do not require more than occasional fine dexterity or fine manipulation in the right upper extremity.  Plaintiff could perform simple, routine, unskilled jobs, SVP 1 or 2 level, with little writing or reading.  Plaintiff is able to attend tasks and complete schedules.  Plaintiff requires jobs that are low stress, low concentration, and low memory, meaning no production pace work and jobs with no more than two-step tasks, with little decision-making, changes in the work setting, or judgment to do the work.

6.  Plaintiff is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7.  Plaintiff was born on September 13, 1962 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Plaintiff subsequently changed age category to closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

8.  Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. part 404, subpart P, appendix 2).

10.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  Plaintiff has not been under a disability, as defined in the Social Security Act, from October 14, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(D.I. 10-2 at 17-27)

## III. STANDARD OF REVIEW

32

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

"substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806

F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not

undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of

record. *See id.* In other words, even if the reviewing court would have decided the

case differently, the ALJ's decision must be affirmed if it is supported by substantial

evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the

evidence, but more than a mere scintilla of evidence. As the United States Supreme

Court has noted, substantial evidence "does not mean a large or significant amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Supreme Court also has embraced this standard as the appropriate standard for

determining the availability of summary judgment pursuant to Federal Rule of Civil

Procedure 56. "The inquiry performed is the threshold inquiry of determining whether

there is the need for a trial—whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of

Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the

33

governing law, there can be but one reasonable conclusion as to the verdict.  If

"reasonable minds could differ as to the import of the evidence, however, a verdict

should not be directed."  *See id.* at 250-51 (internal citations omitted).  Thus, in the

context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the

substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by

countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other

evidence-particularly certain types of evidence (e.g., that offered by treating

physicians)—or if it really constitutes not evidence but mere conclusion."  *See Brewster

v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110,

114 (3d Cir. 1983)).  Where, for example, the countervailing evidence consists primarily

of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the

subjective pain and specify his reasons for rejecting these claims and support his

conclusion with medical evidence in the record."  *Matullo v. Bowen*, 926 F.2d 240, 245

(3d Cir. 1990).

  "Despite the deference due to administrative decisions in disability benefit cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or

remand if the [Commissioner]'s decision is not supported by substantial evidence.'"

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d

968, 970 (3d Cir. 1981)).  "A district court, after reviewing the decision of the

[Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the

[Commissioner]'s decision with or without a remand to the [Commissioner] for

rehearing."  *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.  DISCUSSION

## A. Disability Determination Process

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity[42] to perform his past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel,* 228 F.3d 259, 262–63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

---

[42] A claimant's residual function capacity ("RFC") is "that which an individual is able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d. Cir. 2001).

35

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2), (3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

### B. Arguments on Appeal

On appeal, plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ: (1) improperly found that plaintiff had an RFC for a range of light work; (2) failed to afford proper weight to the opinions of treating physicians and the agency's consultative physicians; (3) failed to adequately assess plaintiff's credibility as to her complaints of disabling pain, numbness, and need to use a cane; and (4) improperly concluded that plaintiff could perform certain jobs. (D.I. 16; D.I. 19) Defendant counters that substantial evidence supports the ALJ's analysis of plaintiff's RFC, the opinion evidence, credibility assessment, and plaintiff's ability to perform certain jobs. (D.I. 18)

### 1. RFC determination

Plaintiff contends that the ALJ's determination that she can perform "a range of light work" is improper and the ALJ should have found that she was limited to sedentary work. Specifically, plaintiff contends that the medical opinions do not reflect that she is able to do the standing and walking required of light exertional work.

According to the regulations:

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small
> tools.  Although a sedentary job is defined as one which involves sitting, a
> certain amount of walking and standing is often necessary in carrying out
> job duties.  Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.

> "Occasionally" means occurring from very little up to one-third of the time.
> Since being on one's feet is required "occasionally" at the sedentary level
> of exertion, periods of standing or walking should generally total no more
> than about 2 hours of an 8-hour workday, and sitting should generally total
> approximately 6 hours of an 8-hour workday.  Work processes in specific
> jobs will dictate how often and how long a person will need to be on his or
> her feet to obtain or return small articles.

Sedentary work is "work performed primarily in a seated position [and] entails no

significant stooping.  Most unskilled sedentary jobs require good use of the hands and

fingers for repetitive hand-finger actions."  SSR 83-10, 1983 WL 31251.

> Light work involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job is in this category when it requires a
> good deal of walking or standing, or when it involves sitting most of the
> time with some pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range of light work, you
> must have the ability to do substantially all of these activities. If someone
> can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

> "Frequent" means occurring from one-third to two-thirds of the time.  Since
> frequent lifting or carrying requires being on one's feet up to two-thirds of a
> workday, the full range of light work requires standing or walking, off and
> on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may
> occur intermittently during the remaining time.  The lifting requirement for
> the majority of light jobs can be accomplished with occasional, rather than
> frequent, stooping.  Many unskilled light jobs are performed primarily in
> one location, with the ability to stand being more critical than the ability to

> walk. They require use of arms and hands to grasp and to hold and turn
> objects, and they generally do not require use of the fingers for fine
> activities to the extent required in much sedentary work.

The primary difference between sedentary and most light jobs is the requirement of "a

good deal of walking or standing." Light work requires "greater exertion" than sedentary

work; "e.g., mattress sewing machine operator, motor-grader operator, and road-roller

operator (skilled and semiskilled jobs in these particular instances). Relatively few

unskilled light jobs are performed in a seated position." SSR 83-10, 1983 WL 31251.

In determining which of the RFC categories applies if plaintiff must "alternate

periods of sitting and standing," "[s]uch an individual is not functionally capable of doing

either the prolonged sitting contemplated in the definition of sedentary work (and for the

relatively few light jobs which are performed primarily in a seated position) or the

prolonged standing or walking contemplated for most light work." In such "cases of

unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the

implications for the occupational base." SSR 83-12, 1983 WL 31253.

According to plaintiff, if the ALJ had accepted the medical opinions of her treating

physicians[43] and found that plaintiff had an RFC limiting her to sedentary work, plaintiff

would be disabled as a matter of law pursuant to the Medical–Vocational Guidelines

("grids"). The grids set out various combinations of age, education, work experience

and RFC and direct a finding of disabled or not disabled for each combination. *See* 20

C.F.R. Pt. 404, Subpt. P, App. 2. The court has carefully reviewed the ALJ's RFC

determination in light of the proffered medical opinions and evidence. In particular, the

RFC analyses provided by Dr. Patel, Dr. Kates, and Dr. Barrish are unduly restrictive in

---

[43] A point addressed further below.

38

comparison to the objective evidence of record. For instance, both Drs. Varipapa and Patel (the physicians treating plaintiff most regularly) found on numerous occasions that plaintiff had full range of motion, a normal gait, and no gross motor deficits. In February 2012, Dr. Patel found that plaintiff could walk less than a block without resting or severe pain, but did not need a cane to ambulate. In October 2012, Dr. Barrish noted that plaintiff needed a cane and she could walk less than 10 feet without using it. There is no notation in the medical records of a prescription for a cane. Drs. Kates and Barrish completed their evaluations after consulting once with plaintiff. While it is true that an individual of plaintiff's age, education and work experience with a residual functional capacity for sedentary work would be disabled as a matter of law under grid rule 201.12, the evidence at bar[44] supports the ALJ's finding that plaintiff could perform light work with restrictions. The ALJ properly adjusted his hypothetical to reflect plaintiff's limitations, including her need to alternate between sitting and standing. Accordingly, grid rule 201.12 is inapplicable.

## 2. Weight of medical opinions and evidence

A treating physician's opinion is afforded "controlling weight," if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [claimant's] case record." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(c)(2). The more a treating source presents medical signs and laboratory findings to support his/her medical opinion, the more weight it is given. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded.

---

[44] Discussed further below.

20 C.F.R. §§ 404.1527(c)(3-4). An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Lyons-Timmons v. Barnhart*, 147 Fed. Appx. 313, 316 (3d Cir. 2005). Even when the treating source opinion is not afforded controlling weight, it does not follow that it deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). These factors include the nature and extent of the treatment relationship, the length of the treatment relationship, the frequency of examination, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*; *see* 20 C.F.R. § 404.1527(d)(2)-(6); *see also* 20 C.F.R. § 416.927. If an ALJ does not conduct this analysis, a reviewing court cannot determine whether the ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand. *Gonzalez*, 537 F. Supp. 2d at 661 (citation omitted). To that end, if a reviewing court is denied this opportunity, the claim must be remanded or reversed and all evidence must be addressed. *Id.* (citation omitted).

Plaintiff argues that the ALJ rejected the expert medical source opinions and substituted his own opinion regarding plaintiff's functional abilities and limitations (especially in reaching the RFC finding). Plaintiff argues that the ALJ did not weigh all probative evidence and did not apply the factors in determining the weight to assign to the various medical opinions. Plaintiff asserts that the ALJ ignored her hand symptoms when assessing her ability to use her hands for lifting, carrying, and manipulating

objects.  Finally, plaintiff argues that the ALJ did not perform his duty of developing the record.

At bar, the ALJ discussed the objective medical findings regarding plaintiff's lower extremity complaints, noting the many "normal" findings in the record.  The ALJ then analyzed each of the three RFC evaluations.  As to Dr. Patel's opinion, the ALJ concluded that it should not be given controlling weight as it was not supported by the medical and laboratory evidence or the treating records as a whole.  Dr. Patel opined that plaintiff's medication caused fatigue and dizziness, but plaintiff denied any side effects from her medication.  The ALJ did not give controlling or significant weight to Dr. Kates' opinion, noting that Dr. Kates did not treat plaintiff regularly and his opinion was not supported by the record as a whole.  The ALJ also analyzed Dr. Barrish's opinion and concluded that it should be given limited weight as it was disproportionately restrictive, when compared to the objective and clinical findings in the record.  The ALJ gave significant weight to Dr. Barrish's opinion that plaintiff is able to use her right upper extremity occasionally as such opinion was consistent with the record evidence, including that plaintiff had full range of motion in the wrists and hands.  The ALJ discussed the opinions of the physicians at CNMRI, which include the opinions of Dr. Varipapa.[45]

Both Drs. Patel and Varipapa diagnosed plaintiff with diabetic neuropathy.  On numerous occasions, Dr. Patel noted plaintiff's lack of cooperation with diet and

---

[45] Plaintiff complains that the ALJ did not specifically discuss Dr. Varipapa's one page form opinion completed on August 20, 2009 finding that plaintiff could not work at her usual occupation for a period of 6-12 months and could not work full-time.  Such opinion predates the alleged onset date of disability of October 14, 2009 and contains no remarks or specific functional limitations.

41

exercise in treating her diabetes. Moreover, plaintiff continued to smoke contrary to the advice of her care providers. *See* 20 C.F.R. § 416.930(a) (requiring as a prerequisite to a benefits award that claimant comply with treatment that can restore ability to work, unless there is good reason for non-compliance). Based on the evidence of record, the ALJ considered all the relevant evidence and consistently compared the objective medical findings to the disproportionately limiting assessments provided. The court cannot conclude that the ALJ's opinions (including the RFC assessment) are deficient or unsupported by substantial evidence. *See Monsour Med. Ctr.*, 806 F.2d at 1190.

### 3. Plaintiff's credibility

When making determinations as to a claimant's credibility, an ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); 20 C.F.R. § 404.1529(c). Plaintiff argues that the ALJ's conclusion that "there is no indication that a cane is medically necessary" is unsupported by the medical opinion evidence of record. As discussed above, in February 2012, Dr. Patel found that plaintiff could walk less than a block without resting or severe pain, but did not need a cane to ambulate. In October 2012, consulting physician Dr. Barrish noted that plaintiff needed a cane and she could walk less than 10 feet without using it. On November 2, 2012, Dr. Varipapa noted that plaintiff had a normal gait and was able to stand without difficulty. The ALJ's opinion considered the medical evidence of record, which indicated normal strength and range of motion. There is no notation in the medical records of a prescription for a cane.

As to plaintiff's subjective complaints of pain and headaches, the ALJ cites to plaintiff's testimony regarding her pain and symptoms. He concluded that although plaintiff's "medically determinable impairments" could reasonably cause plaintiff's symptoms, plaintiff's statements "concerning the intensity, persistence and limiting effects" of her symptoms are not entirely credible. The ALJ's reasoning as to the extent of plaintiff's symptoms, particularly her peripheral neuropathy, is supported by record evidence and the court finds no reason to disturb the findings.[46] *See Metz v. Federal Mine Safety and Health Review Com'n*, 532 Fed. Appx. 309, 312 (3d Cir. 2013) ("Overturning an ALJ's credibility determination is an 'extraordinary step,' as credibility determinations are entitled to a great deal of deference.") (citation omitted).

### 4. Plaintiff's ability to perform certain jobs

Plaintiff argues that her medical limitations prohibit her from performing the jobs suggested by the VE. Essentially, plaintiff's arguments reiterate that the ALJ erred in his determination of the appropriate RFC, particularly as to her manual dexterity. For the reasons discussed above, the ALJ's determination of the appropriate RFC is supported by substantial evidence.

### V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied. An appropriate order shall issue.

---

[46] Plaintiff's headaches are not included as a diagnosis in the RFC evaluation provided by the three physicians. The medical records reflect treatment for headaches, including an instance of receiving an injection and experiencing complete relief after 10 minutes. That the ALJ did not specifically discuss plaintiff's headaches does not negate his credibility assessment of plaintiff's pain as a whole.

43